Good morning, Your Honor. My name is Lori Tyker, and I'm appearing on behalf of the appellant Engenaro Martino, and I'll attempt to reserve four minutes for rebuttal. Mr. Martino is serving life without in a Nevada prison after being convicted of murdering his wife of one month, Patricia La Follette. They were married in December of 91, and she went missing the beginning of January of 92. Mr. Martino was charged two years later based upon statements made by one witness, James Brasington, that Mr. Martino, he witnessed Mr. Martino strangle Ms. La Follette in their shared motel room between the three of them, and Mr. Martino later allegedly asked for his assistance, went and dumped her body in a mine shaft, and no body has ever been found. Mr. Martino was charged based upon Mr. Brasington's statements, and the state has conceded repeatedly throughout these proceedings that no case could have been made without him. Mr. Brasington testified at the first trial. The jury hung 7-5. They found Mr. Brasington to be unbelievable. Upon retrial, the state filed a motion to use prior testimony approximately 18 days before trial, saying that he was unavailable. His testimony was read to the jury by a female court clerk, and Mr. Martino was convicted. This is a habeas case, and the issue here is whether the state met its burden approving Mr. Brasington's availability at Mr. Martino's retrial through reasonable good faith efforts, and similar to the case that was heard two cases ago, there's an interesting standard of review question presented before the court. It's questionable as to whether or not the Nevada Supreme Court, upon direct appeal review, cited cases that were derived from federal constitutional principles. Along that line, we have a Williams v. Cavazos written by my good colleague to the left, which the Supreme Court has taken. Should we wait? Should we await the outcome of that case before this case is decided? Well, I'm well aware of that case, and I'm confident that the outcome is going to be favorable to Mr. Martino. What an interesting perspective. Let's see if your confidence is justified. Well, you could wait and see that. However, I think that you can look at it, I think that you can get to de novo review based upon two different ways. Based upon that way, under review, similar to Williams v. Cavazos, as to whether or not it was decided under state law, or in the alternative, whether or not the Nevada Supreme Court's order is contrary to clearly established law. If you take a look at the opinion that was written by the Nevada Supreme Court, they talk about the state law evidentiary standard and the evidentiary rule in terms of the admission of the testimony when a witness is unavailable. What's interesting, and why I believe an argument can be made that the Nevada Supreme Court's order is contrary to, is that if you look a little bit further in the Nevada Supreme Court's case law, they come out specifically in 2008 in Hernandez, and they specifically say, you know, we've been looking at these cases in this way, and we've been reviewing them under an abuse of discretion standard, and we recognize that we've been doing that, but we shouldn't have been doing it that way. So are you saying, then, that we could look at the second prong of your attack, forget about Williams for the moment, and say, you know, the state just didn't, it's just contrary to federal law on the second part? Yes, either way. And I would maintain that even if you were to find it would be an unreasonable application, but I believe that there's a strong case that there should be no deference under Williams as well as contrary to basis. When you're looking at the issue as to whether or not the state failed to meet the federal constitutional burden to demonstrate his unavailability by the introduction of his prior testimony, in analyzing whether or not the declarant is unavailable, the state has to show, and it's the prosecution's burden, and any factual uncertainty has to be held against, to secure the witness's attendance has to be counted against the state. If you take a look at that evaluation, the state has to show that the authorities made a good faith effort and that it was reasonable, and the reasonableness needs to be judged against the specific circumstances of the case as well as the obligation of good faith. In terms of taking a look at the reasonableness of the effort, again, pursuant to U.S. Supreme Court case law, those efforts have to be judged against the surrounding factual context here, and you have a lot. You have a lot in terms of determining whether or not what, again, the Supreme Court has held, is that the state's efforts have to be genuine and they have to be undertaken in a competent manner. It can't be... In this case, the state undertook, at best, feeble efforts that largely mimicked prior efforts that they determined didn't work the first time around when they were trying to get Brasington there to testify for the preliminary hearing. They knew exactly what had to happen in order to get him there, and they did it for the preliminary hearing in the first trial. They had the flush him out. They had gone... Nevada members of the Sheriff's Department had gone to Minnesota, and they talked to him about what his testimony was going to be. They went there twice. Prior to the preliminary hearing, he had said he was going to come. They tried to contact him through the ways that they knew to do that, but they couldn't. And so what did they do? They sent out a member of the Sheriff's Department, and he went out and spent four days in Minnesota finding him, talking to his employers, talking to his friends, talking to people who knew where he was. They tracked down where he lived by looking at the unemployment records and getting a subpoena in terms of his address. They flushed him out. When they flushed him out, he miraculously called Nevada and talked to the district attorney's office and said, yeah, I'm going to be there. I'll be at the preliminary hearing. I can be there. Don't worry. I'll get there on my own. So the member of the Sheriff's Department left. The deputy went back to Nevada. They continued to try to get Mr. Brasington to show up for that preliminary hearing until 30 minutes before when they finally had to file what in Nevada is called a Hill or a Bustos motion to continue the trial because he didn't show up. After that, they knew because, again, they'd flushed him out. They spent all this time. They found him. They found him. They got him to call. They issued a material witness warrant, and he testified at the preliminary hearing and he testified at the trial. After the first trial, what did the state do? There's an affidavit that was filed by the district attorney that was prosecuting the case that said, well, you know, we got an oral promise from him to appear, which is a little bit shaky in terms of the record as to whether or not that actually occurred, and he gave us a P.O. box and a phone number, and he's going to come back at trial. We talked to people that he knew and phone numbers on the phone, and we weren't able to find him. And so 19 days before trial, I'm going to move that you were allowed to use the previous trial testimony from the first trial. They didn't keep going. They found Mr. Brasington in Puerto Rico when they had to find him the first time in order to get him to testify at that first trial. What happened at the first trial was the jury didn't believe him. They didn't believe him, and that's evidenced by the verdict, the fact that there was a mistrial, and it's evidenced by a newspaper article. In terms of good faith, I don't know how you can find anything but bad faith here, where you have the press talking to the prosecutor in the case after the mistrial and saying, well, yeah, we're going to try him again, and, quote, it would be nice to go before the jury with a witness, but who knows? Maybe the transcript will be even better. That can't possibly be found to be anything but bad faith in terms of the efforts that they made and phoning it in and stopping and forgetting even to pretend to try to find Brasington after 19 days before trial and just saying to the court, let's read it in. In terms of the Brecht analysis, you've got a Brecht analysis as to whether or not the error had the substantial and injurious effect on the influence in terms of determining the verdict. The Brecht analysis is obvious here. You had a mistrial the first time. They didn't believe him. The second time he got convicted, for all of the reasons that it's important, the importance of the witness actually being in front of the jury, everything is completely obvious here. If there's no further questions from the court, I'll... Thank you. Thanks. I don't think you actually had any questions. I'm sorry? I don't think you had any questions, let alone further questions. I know, I think it's a first. First of the day. And maybe the first for you. It is. Well, we'll see if we can brim up a few questions for you. May it please the Court and Counsel, my name is Robert Wieland. I'm a Senior Deputy Attorney General employed by the Office of the Attorney General of the State of Nevada. I have the privilege and honor of representing the respondents. Judge Smith, you asked about the Williams v. Cavazos circumstance. There are a multitude of reasons why that does not apply to this circumstance, and de novo review is not appropriate in this case. The first thing is that the question that was presented to the Nevada Supreme Court was presented as a federal constitutional question. I direct the courts to excerpt record 981. Under Harrington, which this court acknowledges in the Cavazos case, there is a presumption that the case was in fact resolved on the merits. In this particular case, the state filed its answer asserting that deferential review was appropriate under the Anti-Terrorism and Effective Death Penalty Act. The federal public defender agreed with that in their reply to the state's answer and in fact argued that the Nevada Supreme Court's decision was contrary to or an unreasonable application that clearly established federal court, excuse me, Supreme Court decisions. I direct the court to excerpt to record 1176, where they specifically addressed it with specific reference to ground 1A of the federal case. They reviewed it as abuse of discretion, right? Well, the Nevada Supreme Court said, with respect to abuse of discretion, to the factual finding that he was unavailable. Okay, and that's the key. It was referenced to a factual finding and the abuse of discretion was, the abuse of discretion test, just like the tests in this court, when you're reviewing federal district court findings, was there an abuse of discretion in making that factual finding? But in this case, isn't the standard under Lilly v. Virginia de novo review? Supreme Court case? No. Of unavailability. On the issue of unavailability, right? No, not in this case because we're under the auspices of HEDPA. And even if it were, you look at what was... Supreme Court law. No, I don't believe it is, and even so, Your Honor, if you look what was presented to the state district court judge, at the time he made the decision, there was the affidavit prepared by the prosecutors detailing all the stuff that he had done, and contrary to counsel's representations, it simply was not a cursory effort. What counsel had done was, as reflected by the record and as reflected by the Nevada Supreme Court, they say, moreover, the record supports that conclusion. The prosecutor had informed Brasington they would be required to testify at the trial, which was scheduled in July. Brasington gave the prosecutor an address. Brasington gave the prosecutor a phone number. And as of the date of the affidavit, the prosecutor was unable to contact Brasington despite contacting his prior addresses, not just one address, but the prior addresses and phone numbers, contacting Marshal Jim Propotnick and his confidential informant in Hawaii, contacting law enforcement in Minnesota, who was trying to locate Brasington for a DUI charge there, and checking for new listings for Brasington in towns where he was known to stay. How do you think that compares to the effort they made the first day? I think it compares very favorably. It shows that there was a multi-state effort to try to locate this person. And going back... But did somebody go physically to the last known address, as they did the first time around up in Minnesota, and start knocking on doors and running those traps and trails? I cannot say yea or nay to that, Your Honor. I think you can. You can tell us that the record shows that they didn't. No, it says the record shows that they contacted his prior addresses and phone numbers. Look, you're relying on this affidavit as to what happened, aren't you? The same thing as the judge did. Right. You and the judge are in the same ballpark. We have to, because that's what was before the judge's time. And you were asked whether the state or the prosecutor, whoever made this effort to locate him, whether he sent people out of state to do it, to Minnesota. And it seems to me your answer is very simple. If he did, he didn't tell the court. We don't know. I don't know. And I think that's the point I was trying to make, apart from... If he had, wouldn't you think he would have put it in the affidavit? I don't know that, Your Honor. It may have been common knowledge. And wasn't it up to the prosecutor to tell the judge that? Say, by the way, Judge, this is what we mean by contact. We've done this, that, and the other thing. We've sent people here flying over there and so forth. And this guy was a real wandering boy, right? He was found in Puerto Rico from Minnesota. There was somebody in Hawaii who had gave information. He's all over the map, literally. Well, as the prosecutor says, he contacted prior addresses, phone numbers. They looked for him in Minnesota. They looked for him in Hawaii, as is apparent from the affidavit. With respect to the Cavazos issue, going back to that, Mr. Martino is taking a position inconsistent with what he took previously when he filed his reply in the federal district court. The present situation is additionally distinct from Cavazos, as was reflected in Cavazos. In this circumstance, there is no denial of a petition for review. The Nevada Supreme Court ruled on the merits of the claim that was presented, and, indeed, the federal public defender concedes that at Excerpt of the Record 1176. Martino's brief to the Nevada Supreme Court on direct appeal cited Nevada cases regarding the application of the Sixth Amendment. I direct the Court to Excerpt of the Record 981, the citation to Anderson and Esau. And, indeed, if you look at the opening brief filed by Mr. Martino's appellate counsel, he makes reference specifically to those cases. I assume you would agree with what Judge Smith suggested, that if we get to that issue, we could hold the issuance of a decision until the Supreme Court ruled. It's not going to be terribly long before they rule, and my prediction as to the outcome may be somewhat different, having had some experience with the Supreme Court. But it may not be necessary, so why don't we just assume that won't be dispositive of the case and proceed with the rest of the argument. All right. That being the case, Your Honor, I submit that deference is afforded under NRS 2254.2d, that Kavazos won't apply for that reason and other reasons I have, including which the statute under which the Nevada Supreme Court cited actually echoes the requirements under Barber. And the petitioner in this case has said, really, and this Court did not grant a certificate of appealability with respect to the reliability of Mr. Brasington's testimony before the jury, the testimony that was read to the jury, if there's no issue of reliability with respect to that testimony. And there really isn't any issue. But what else would cause the jury to hang the first time around? I have no idea, Your Honor. I mean, counsel is representing they didn't believe him. I don't know that that's the case, and quite frankly counsel doesn't know that that's the case. That's pure speculation. But isn't it a fair inference to draw, under all the circumstances, if you have one witness, and the jury either accepts that testimony or it doesn't accept it? I mean, when she first said that, I said, time out. We can't resort to jury room. But then as she explained her basis for it, why isn't that a fair inference to draw? I'm sorry? Why isn't it a fair inference to draw that that caused or certainly very likely caused the initial verdict? I don't know that it's a fair inference. You can sit there and say if you're willing to draw that inference. Well, let's assume that I do. Then what difference does it make in your view, if any? Does it make any difference one way or the other? I conclude that they did not believe him the first time around when they saw him on the stand and heard him. Does that have any effect on what we're doing here? The evidence that was remaining was the fact at that time Mr. Martino, based on the testimony of other witnesses, apparently stated how much he had disliked his wife. He had forged her name on checks. He'd already been convicted of that. And I guess with respect, again, to the efforts, there's no allegation of falsity with respect to the affidavit that the If you look at the record at that particular point in time, in the hearing before the state district court, the prosecutor said he had submitted the affidavit, the judge apparently looked at it, and opposing counsel didn't really object other than to say, well, I'm making a blatant objection just to protect Mr. Martino. He didn't offer anything saying, oh, here's something else that you should have done. Moreover, and he most certainly could have, and indeed, in fact, instead of doing that, he said, well, I guess the prosecutor isn't going to object, and he worked a deal with the prosecutor, so the prosecutor wouldn't object to him presenting the prior testimony of Dr. Callista or somebody, as I recall. Let me ask you, do you agree that the test under Moats, as to the prosecutor's negligence in not taking the necessary steps to ensure the return of the witness, is the proper statement of the law? Taking, well, we aren't dealing with a circumstance where somebody's been deported. No, no. Or something as where the prosecutor knew somebody was going to be deported, and then they let him go, and then they don't make the effort to return him or anything. We're not talking about a barber circumstance or, as the petitioner talks about, U.S. v. Ida and U.S. v. Mann. We're not talking about that kind of a circumstance. So you say that Moats does not apply in this kind of a case? No, it doesn't, and I think it's very clear from this that, contrary to counsel's suggestions and representations, the efforts were not feeble. They were not perfunctory. No, no, it's not a question of the representations. We have a record as to whether these efforts are adequate. And one of the measures is comparing the prosecution's efforts to what efforts they made the first time, when they were very anxious to have him there. I think they were anxious to have him there the second time, too. The comment counsel refers to in the newspaper can be taken, you know, in favor of the prosecution as well. Well, I'm not asking really for anyone's evaluation as much as going by the record, whether the record as to what the prosecutor did to ensure his presence the second time is similar to what the prosecutor did when he was very anxious the first time. Well, I think what he did the second time, Your Honor, in respondent's estimation satisfies the constitutional requirements. It says good faith. It doesn't say heroic. It doesn't say you have to, whether you have no belief or not that somebody is in New York City, look through the entire New York City phone book. No, nobody is suggesting you look through the New York City phone book. The Tenth Circuit, for instance, has a fairly recent opinion, which is not binding on us. It's similar to the kind of decision we have to make, in which it said it compared the prosecutor's efforts the second time to what he had done the first time in order to determine whether it was a good faith effort. You may think that opinion is wrong, and we may think it's wrong, but I was just trying to get the answer to the facts so that if we happen to agree with the Second Circuit, we could compare the facts. I don't know that comparison of effort in one circumstance necessarily with a second circumstance is necessarily a correct analysis in the First Circuit, Your Honor. I didn't say it was. I just said in case we determined that it was. All right. I was trying to determine what the facts were. Unless the Court, I'm sorry. No, I was going to tell you, but 20 seconds left. Oh, okay. You were about to say unless we have any further questions. Unless the Court has any other questions, I respectfully request the Court affirm the decision of the Federal District Court based on the record before it at that point in time. Thank you, Your Honor. Thank you very much. Thank you both. The case is adjourned. May I ask for a question? Yes, sir. If I may. Counsel indicated that in your papers below you acknowledge that the ADEPA standard controls. Is that correct? And if so, does that preclude us from applying any other standard? No, I don't believe that it does. And I don't agree that we conceded. I think that if you take a look at the opening brief, we laid out a whole analysis in terms of it's either not entitled to ADEPA deference, therefore de novo review. In the alternative, it's contrary to. In the alternative, it's an unreasonable application. I don't believe that we conceded that. I don't believe that. If you take a look at what we discussed in the briefing in terms of the cases that the Nevada Supreme Court ruled upon within the order dismissing the appeal, they talk about ASEP and FUNCHES. And there's an argument as to whether or not those are analyzed under state law or if there's a federal constitutional basis. I don't believe that there's an issue in ASEP. I think that's purely in rereading the case and preparing for argument. I think that's purely a state ruling in terms of the abuse of discretion. FUNCHES is a little bit iffy, but it's hard for me to determine that a federal constitutional claim was actually applied in that and the court did rule on it based upon abuse of discretion. I would recommend and urge the court, well not recommend, I would urge the court to take a look at Hernandez because Hernandez really does show, and it's a very infrequent occurrence where you have the Nevada Supreme Court actually saying, a state court saying, you know. We've been doing it wrong all along. Yeah, we've been doing it wrong all along. It's time to quit. Exactly. Let's get on board. Exactly. So, if there are no further questions. Can I just have one other? Sure. If I may. Of course. And what is your response to, I was a little startled when you first said, you know, the jury didn't believe him. And counsel suggested, well, there were other witnesses, you know, mixed into the whole blend. And what's your response to his response to my question about your assertion whether the jury believed him or not? Because I think it's an important assertion. I understand. In terms of whether or not the jury believed him, there is evidence in the record before the court, and I'd refer the court to in the excerpts 944 and 946. The newspaper article is talking, and the district attorney also, speaking in pre-motion before the second trial, talks about the believability of Mr. Brasington. And the district attorney is quoted as to the fact that he spoke with the jurors after the first trial, and they didn't believe him, and that's why it mistried. It's very clear. The district attorney's statement is quoted in the newspaper? Yes, the district attorney. But there's no other evidence as to what the district attorney said other than the newspaper article? No. But, again, that hasn't been. Is there an objection to introducing that newspaper article in the record? There's no objection. There's been no objection made throughout the proceedings. In addition, in terms of what the other evidence was that existed to convict Mr. Brasington, again, the first trial ended in a mistrial based upon his testimony, him face-to-face with the jury, and them being able to see and evaluate his testimony. He was the sole eyewitness. The other evidence that was presented on trial were people testifying that she was missing. That's it. That no one had heard. People hadn't heard from her. The investigating detective testified about his investigation with Mr. Brasington and the unsuccessful mine shaft search that resulted based upon them believing that they thought they knew where her body was. There were maids and a manager that testified at two different hotels in terms of a possible overlap of stay of days as to whether or not Ms. La Follette's body was allegedly in the hotel for a couple of days. Again, nothing linking Mr. Martino with actually having allegedly killed her. There were people testifying that she didn't contact them after she went missing. Her family testified that she was missing. There was evidence of checks passed by Mr. Martino after she disappeared. Again, they were married. There was a reason and a defense as to why he may very well have passed those checks after she left and took off. There was testimony by plenty of witnesses saying that she talked about going to Alaska or going to Canada, and there was evidence saying that she had to leave. So really, without Mr. Brasington, and that is over and over and over stated within the record, there was no evidence that the state could have put on in order to convict Mr. Martino. Thank you, Counsel. Thank you. The case is now submitted.
judges: Carr, Reinhardt, Smith